LUKE OWEN v. J. M. KURN and JOHN G. LONSDALE, Trustees of St. Louis-San Francisco Railway Company, a Corporation, Appellants.—148 S. W. (2d) 519.

Division Two, March 12, 1941.

*E. G. Nahler, H. E. Sheppard* and *Mann & Mann* for appellants.

*Sylvan Bruner, Vance Julian, Sizer & Myres* and *Edward V. Sweeney* for respondent.

BOHLING, C.—This is an action under the Federal Employers' Liability Act (35 Stat., pp. 65, 66, 45 U. S. C. A., Ch. 2, p. 92). ■ Luke Owen, one of defendants' section foremen, recovered a judgment for $10,000 against J. M. Kurn and John G. Lonsdale, Trustees of St. Louis-San Francisco Railway Company, a corporation, and defendants appealed. Plaintiff was injured by an extra passenger train. Separate instructions predicated a recovery upon specifications of alleged negligence (1) in failing to give advance notice to plaintiff, in accordance with an established custom, of the running of said extra passenger train; (2) failure of the enginemen to whistle for the curve involved in accordance with long-established custom and (3) in violation of a rule. of defendants; and (4) humanitarian negligence in failure to warn, or slacken speed, or stop the train. The answer was a general denial, and also pleaded the assumption of risk, contributory negligence, and sole negligence on the part of plaintiff. Defendants question, principally, the submissibility of plaintiff's issues. We take the evidence favorable to plaintiff.

Plaintiff, a section foreman for twenty-one years, had charge of a section of defendants' mainline roadbed extending from mile post 119½ to mile post 127, in the vicinity of Liberal, Missouri. The mile posts are numbered from Kansas City south, the miles being designated by numbers placed on telegraph poles along defendants' right-of-way. These poles are 132 feet apart. The accident occurred on October 19, 1937, while plaintiff and his crew were dressing and spotting the chats on defendants' roadbed at and near mile post 120. Defendants' track is described as extending in a generally north and south direction at the place involved. Some distance south of mile post 120, the track has a curve (or swerve) to the northwest. Approximately 32 poles south of mile post 120 is a block signal or semaphore. Proceeding north from the semaphore, the track is about one per cent down grade for approximately twenty poles to a bridge known as C-120, where it curves to the right for about four poles, and proceeding through a cut, is on an ascending grade of approximately three quarters of one per cent to the scene of the accident. One at or near mile post 120 could see a train at the tenth pole south along the track, but the embankment on the east of the cut and brush and trees cut off other views of a train north of the semaphore except at a point about six poles north of the semaphore,

where it could be seen for about 132 feet. Plaintiff and Bert Tyler were pushing a push car loaded with chats south at mile post 120 when plaintiff looked up and first saw an approaching extra passenger train six or seven poles to the south. They started to remove the push car from the track, and had succeeded in getting all but the southeast corner of the push car clear of the east rail, the southeast wheel having lodged against the east rail. While plaintiff was about six feet from the rail and had hold of the push car, the train struck the corner of the push car causing his injuries. He testified he was busy removing the push car from the track and did not look again towards the train. There was no warning by bell or whistle. The train was approaching without making much noise. Other members of the crew did not discover it until it was very near the push car. The engineer, as the train proceeded north from the semaphore, saw, for a short distance, the outline of men working near mile post 120. His view was then obstructed and he did not see the men and push car until he "came out of the sag." He was traveling sixty to sixty-five miles an hour. He first thought they were going to get the push car off the track, but he started to apply the brakes when probably about four or five pole lengths from the push car.

Did plaintiff, knowing of the approach of the train, assume the risk of injury in remaining upon or near the track to remove the push car? We think not.

"Except as provided in section 4 of the act, the employee assumes the ordinary risks of his employment; and, when obvious, or fully known and appreciated, he assumes the extraordinary risks and those due to negligence of his employer and fellow employees." [Delaware, L. & W. Rd. Co. v. Koske, 279 U. S. 7, 11, 49 Sup. Ct. 202, 73 L. Ed. 578; Arnold v. Scandrett, 345 Mo. 115, 120[1], 131 S. W. (2d) 542, 544 [2]; Toledo, St. L. & W. Rd. Co. v. Allen, 276 U. S. 165, 169, 48 Sup. Ct. 215, 72 L. Ed. 513; Boldt v. Pennsylvania Rd. Co., 245 U. S. 441, 445, 38 Sup. Ct. 139, 62 L. Ed. 385.] The facts of the instant case do not bring it within the exceptions of said section 4 prior to the amendment of 1939 (53 Stat. 1404), and the defense is interposed in bar to plaintiff's cause of action.

We pass the weight negligence, if any, arising from failure to give advance notice of the running of the train involved (hereinafter discussed) may have upon this issue. Defendants, in their brief, concede that plaintiff made a submissible issue of a custom for trains to whistle for the curve involved although contending, since plaintiff saw the train, such negligence was not actionable (also hereinafter ruled). Irrespective of defendants' said contention, the evidence, viewed most favorably to plaintiff, established a risk not normal or usual or ordinarily incidental to plaintiff's employment, but an extraordinary risk, originating out of defendants' failure to whistle.

522

[Delaware, L. & W. Rd. Co. v. Busse, 263 Fed. 516, 522 [2]; Wallace v. United States, 16 Fed. (2d) 309, 311 [2]; Gately v. St. Louis-S. F. Ry. Co., 332 Mo. 1, 9[1], 56 S. W. (2d) 54, 56[1].] Some of defendants' cases, as we read them, involved ordinary risks and are to be distinguished from the instant case; for instance, Toledo, St. L. & W. Rd. Co. v. Allen, supra; Chesapeake & O. Ry. Co. v. Nixon, 271 U. S. 218, 46 Sup. Ct. 495, 70 L. Ed. 914; Chesapeake & O. Ry. Co. v. Leitch, 276 U. S. 429, 48 Sup. Ct. 336, 72 L. Ed. 638, following Southern P. Co. v. Berkshire, 254 U. S. 415, 41 Sup. Ct. 162, 65 L. Ed. 335; Aerkfetz v. Humphreys, 145 U. S. 418, 420, 12 Sup. Ct. 835, 836, 36 L. Ed. 758, 759. The review of Boldt v. Pennsylvania Rd. Co., supra, involved the refusal of a requested charge by plaintiff. We think it involved an ordinary risk, although the discussion of the requested charge embraced extraordinary risks. Until he discovered the approach of the train six or seven poles away, plaintiff had the right to assume proper care had been exercised by defendants' employees for his safety. [Chesapeake & O. Ry. Co. v. De Atley, 241 U. S. 310, 315, 36 Sup. Ct. 564, 60 L. Ed. 1016; Evans v. Atchison, T. & S. F. Ry. Co., 345 Mo. 147, 156, 131 S. W. (2d) 604, 608[10].] There was testimony that plaintiff's duties embraced the removal of the obstructions from the track upon the approach of a train. Plaintiff, then, was confronted with an emergency—the performance of his duty to remove the push car from the pathway of a nearby train approaching at a speed of 60 to 65 miles an hour. Seconds were precious in which to judge and act. The statement of the doctrine of assumption of risk implies both the knowledge of and an appreciation of the extraordinary risk by the servant. An attempt to remove the push car involved some danger but did not threaten an immediate injury as there was time for plaintiff to abandon his efforts and step to a place of safety. Defendants' engineer first thought the obstruction would be removed. Plaintiff testified the train was traveling 60 to 65 miles an hour but that it approached so noiselessly he was unconscious of its nearness while engaged in removing the push car.

With this testimony of record and the burden of establishing this affirmative defense upon defendants, we may not say, as a matter of law, that plaintiff rashly exposed himself to danger and voluntarily assumed an obvious, fully known and appreciated risk of or any subsequently increased risk of immediate injury occasioned in part by negligence chargeable to the master in thereafter failing to exercise due care to seasonably protect him while engaged in his duty of removing the push car from the path of the on-coming train in the emergency first created by the master's negligence. [Chesapeake & O. Ry. Co. v. Proffitt; 241 U. S. 462, 468(c), 36 Sup. Ct. 620, 60 L. Ed. 1102. Consult Moran v. Atchison, T. & S. F. Ry. Co. (Banc), 330 Mo. 278, 290[7], 48 S. W. (2d) 881, 885 [10, 11], certiorari

denied 287 U. S. 621, 53 Sup. Ct. 21, 77 L. Ed. 539; Great Northern Ry. Co. v. Harman, 217 Fed. 959, 960, L. R. A. 1915C, 843, 845; Doyle v. St. Louis, M. Br. T. Ry. Co., 326 Mo. 425, 433 (III), 31 S. W. (2d) 1010, 1012[8-10], certiorari denied 283 U. S. 820, 51 Sup. Ct. 345, 75 L. Ed. 1435.] The facts do not present a case wherein the engineer was privileged, as a matter of law, to assume that in all events plaintiff would timely step to a place of safety or where the giving of seasonable warnings would interfere with the efficient operation of the railroad, and to exonerate defendants from the exercise of due care in the instant case appears inhuman. [Norfolk & W. Ry. Co. v. Gesswine, 144 Fed. 56, 58; Hanley v. Boston & M. Rd., 286 Mass. 390, 395, 190 N. E. 501, 504 [1-8], certiorari denied 293 U. S. 597, 55 Sup. Ct. 112, 79 L. Ed. 690. See observations made in Biernacki v. Pennsylvania Rd. Co., 45 Fed. (2d) 677, 678[1]; Toledo, St. L. & W. Rd. Co. v. Allen, 276 U. S. 165, 173, 48 Sup. Ct. 215, 72 L. Ed. 513.]

Aerkfetz v. Humphreys, supra, cited by defendants, speaks of inattention as contributory negligence: "We see in the facts as disclosed no negligence on the part of the defendants, and, if by any means negligence could be imputed to them, surely the plaintiff by his negligent inattention contributed directly to the injury." Under the Federal Employers' Liability Act contributory negligence authorizes a diminution of the damages; it does not bar recovery. [35 Stat., p. 65, sec. 3, 45 U. S. C. A., p. 379, sec. 53.]

█ We properly may consider here defendants' complaint of the refusal of their requested instruction "D." It told the jury that if, after plaintiff saw the train, plaintiff, in the exercise of ordinary care, could have reached a place of safety, the mere fact that he was unable to remove the push car did not justify him in endangering his own safety and the verdict should be for defendants. Defendants stress McManamee v. Missouri Pac. Ry. Co., 135 Mo. 440, 449(III), 37 S. W. 119, 121(3); Johnson v. Terminal Rd. Assn. (Banc), 320 Mo. 884, 888, 8 S. W. (2d) 891, 892[3], and other cases there cited, all discussing contributory negligence in the rescue of property. Defendants say the instruction follows defendant's approved Instruction "3" in the McManamee case (l. c. 446 and 120, respectively). Plaintiff was not a volunteer but was confronted with and engaged in the performance of a duty in an emergency created by negligence chargeable to defendants. [See the Moran, Great Northern Ry. Co. and Doyle cases, supra. Consult Clark v. Atchison & Eastern Bridge Co., 324 Mo. 544, 562, 24 S. W. (2d) 143, 152[12], and like cases; 45 C. J. 968, secs. 521, 522; 20 R. C. L. 133, secs. 110, 111; Prophet v. Kemper, 95 Mo. App. 219, 225, 68 S. W. 956, 958.] Plaintiff's contributory negligence would not bar a recovery. Instruction "D" was not the law of the instant case.

█ One of plaintiff's instructions predicated a recovery, under the

humanitarian rule, or specifications of negligence in failing to stop, *or* to slacken speed, *or* to warn. Defendants question the submissibility of each of said issues.

First, however, with respect to defendants' contention that plaintiff, having knowledge of the approach of the train at an undiminished speed of 60 to 65 miles an hour, may not complain of any failure to warn as negligence under the humanitarian rule or as primary negligence. Woods v. St. Louis-S. F. Rd. Co. (Mo.), 187 S. W. 11, 12[2], and Peterson v. United Rys. Co., 270 Mo. 67, 75, 192 S. W. 938, 940[3], among the several cases cited, are stressed. Since the purpose of a warning is to impart notice, these and other cases reason that a failure to warn is not the proximate cause of an injury to one who has appropriate actual notice of the approach of the instrumentality inflicting the injury. In defendants' cases the rule was applied to plaintiffs who voluntarily refrained from avoiding the instrumentality inflicting the injury when they had actual knowledge of its approach in ample time to escape and were not confronted with a situation making the issue one of fact for the jury. Note the illustration given in the reasoning of the Peterson case. In the Woods case, one of a section crew riding a hand car around a curve was injured by an on-coming train, which was first discovered about two and a half pole lengths away. The section foreman ordered the men not to try to remove the hand car. Woods, the only one apparently not hearing the order, first took hold of the hand car to remove it and, then abandoning it, ran in the same general direction the train was moving and was injured when the train knocked the hand car against him. That case is not controlling on the instant issue, among other reasons, because: The opinion of RAILEY, C., explicitly discloses in more than one instance that Woods adduced no testimony on any failure to warn and the discussion applying the rule invoked by defendants to the facts of that case was *dictum*. BLAIR and BOND, JJ., of Division No. I of this court concurred in the result. WOODSON, J., concurred in a separate concurring opinion by GRAVES, P. J. Although GRAVES, P. J., is recorded as concurring except as to an issue immaterial here, his separate opinion discloses he was of opinion that no pleaded negligence had been proved; that he passed the admittedly close issue of Woods' contributory negligence in attempting to remove the hand car without developing it, and that the contributory negligence of one acting in an emergency was usually a jury question. Notwithstanding plaintiff's testimony that he received no indication the speed of the train was being reduced during the brief interval he looked at it and that thereafter he heard nothing indicating any diminished speed (which tends to narrow the issue), he also testified the train was approaching so noiselessly he was not conscious of it (which other testimony substantiated) and we may not say as a matter of law, viewing the testimony from plaintiff's standpoint, that

plaintiff had all the notice timely and appropriate warnings would have given and that due care did not embrace such warnings under the peculiar facts of the instant case. There is greater need for warnings from unannounced extra trains than from trains operating under a regular schedule. Also, the jury was privileged to find the failure to whistle for the curve a primary cause so linked to and operating upon the subsequent events as to cause all to become a continuous whole and one of the proximate causes of plaintiff's injury. Hughes v. Mississippi River & B. T. Ry. (Banc), 309 Mo. 560, 580, 274 S. W. 703, 709, states: "Instincts of common humanity dictate that servants of the railroad operating extra trains which are unannounced be required to be on the lookout for section men known to be or likely to be in places of peril and unable adequately to protect themselves. That which should be the law is the law. . . . An unannounced extra train cannot be assured of a track clear of section men unless such section men are working where safety is immediately at hand and where they can see or hear the approach of trains in ample time."

Next. Plaintiff adduced evidence that the situation was observable for ten pole lengths, 1320 feet, to the engineer; that the speed of the train, if traveling at a speed of 60 miles an hour could have been reduced to 50 miles an hour in 400 feet, to 40 miles an hour in 600 feet, to 20 miles an hour in 800 feet, and could have been stopped in 1000 feet. Plaintiff states he was in imminent peril when the train was 1320 feet away. Defendants say imminent peril did not arise until the train was within a few feet of plaintiff. The record does not permit of our accepting either view. Plaintiff saw the train when it was six to seven poles away. At that time he knew of its approach and the distance involved. He and Tyler undertook to remove the push car and succeeded in getting all but one wheel clear of the east rail. Time after time section men experience the necessity for stepping aside that trains may pass and maintain their schedules. Plaintiff was not a novice. He had been a section foreman for twenty-one years. Common sense demonstrates he thought there was time to remove the push car. [Consult Van Dyke v. Missouri Pac. Ry. Co., 230 Mo. 259, 283, 130 S. W. 1, 8.] Defendants' engineer was first of the opinion the push car would be removed; but he testified he started to apply the emergency brake when probably four or five pole lengths from the push car. The jury could find that the engineer then realized the men would not be able to remove the push car and, performing a duty in an emergency, were in imminent peril. Under this state of facts there was, under the humanitarian doctrine, no evidence that the train could be stopped and, with plaintiff testifying he was not conscious of the nearness of the train's approach while engaged in removing the push car, whether slackening the speed, under the humanitarian doctrine, would have prevented the

injury was not removed from speculation. We have said we judicially know an appreciable time must elapse from the realization of the danger by an engineer and the setting of the brakes of a train. [Stark v. Berger (Banc), 344 Mo. 170, 174, 125 S. W. (2d) 870, 872[1].] However, the engine whistle could be operated by an air button. Ample opportunity existed for timely warning plaintiff. [Consult Zumwalt v. Chicago & A. Rd. Co. (Mo.), 266 S. W. 717, 725[6, 7, 9]; Williamson v. Wabash Rd. Co., 139 Mo. App. 481, 491, 122 S. W. 1113, 1116, 156 Mo. App. 542, 546, 137 S. W. 30, 31[2].] Contributory negligence under the Federal Employers' Liability Act operates only to diminish the damages, and the humanitarian rule does not necessarily apply in the sense it is usually invoked under the Missouri law.

 Another instruction predicated a recovery upon a finding of negligence in failing to whistle by a long and short blast for the curve in accordance with subdivision "t" of defendants' Rule 112. Rule 112, in part, reads:

"112. Engine Whistle Signals.

"Note: The signals prescribed are illustrated by 'o' for short sounds, '———' for longer sounds.*

"Sound (t) ———————°

"Indication: When *running against the current of traffic* approaching stations, curves or other points where view may be obscured, approaching trains and when passing freight trains."

Reference to subdivision "t" of the rule in plaintiff's brief omits the portion we have italicised above. The testimony established that "running against the current of traffic" refers to a train proceeding in a direction opposite to which it usually runs on a double track; for instance, a train proceeding west over the south or eastbound track of a double track. Defendants maintain only a single track where plaintiff was injured. Of a different opinion at first, we think plaintiff is not to be deprived of the advantage of the rule. The wording and punctuation of the rule subjects it to a double meaning. One of plaintiff's witnesses testified the portion here involved applied to defendants' railroad, whether single or double tracked. The ambiguity arises, we think, from the omission of a "comma" or an "and" between the words "traffic" and "approaching." If a comma be inserted, the rule required the signal "when . . . approaching . . . curves . . .," as well as "when running against the current or traffic." While much may be said for defendants' construction of the rule, for instance, when considered in connection with subdivision "m" which required a long whistle when "approaching stations" and which defendants say applied to its single track, the record does not disclose that two signals might not be provided, and more reason exists for a rule requiring a whistle to protect those lawfully upon defendants' single track roadbed than upon defendants'

double track roadbed at curves. Ordinary care, depending on the circumstances, might require the sounding of a whistle, rule or no rule. [Consult Hughes v. Mississippi R. & B. T. Ry. (Banc), 309 Mo. 560, 581, 274 S. W. 730, 710; Texas & Pac. Ry. Co. v. Behymer, 189 U. S. 468, 470, 23 Sup. Ct. 622, 623, 47 L. Ed. 905, 906.]

█ Defendants say the evidence failed to establish a custom to warn plaintiff in advance of the running of special or extra passenger trains and that, if the evidence be considered sufficient to establish such custom, any such failure was not actionable negligence in the instant case. The purpose of advance notice of the running of extra trains is to invoke and afford section men an appropriate opportunity under the general rule to protect themselves and permit the operatives of extra trains to proceed under the general assumption they have a clear track; that is, place the operation of said trains on the same basis as the operation of trains moving under a regular schedule. After conceding plaintiff testified that this was the custom, defendants argue that two exhibits offered by plaintiff disclose they were for purposes other than warning plaintiff of the running of the trains therein mentioned. We need not develop the effect of the exhibits as the record does not disclose that the issue necessarily turns upon the probative value of the exhibits, differing from the situation existing in Smith v. Seaman & Schuske Metal Works Co., 344 Mo. 559, 563, 127 S. W. (2d) 435, 437[1]. Defendants' conceded effect of plaintiff's testimony, we think, is not destroyed as a matter of law by plaintiff's additional testimony that he did not receive notice in advance of the running of extra freight trains as differences may exist with respect to the ultimate factual issue between the operation of passenger and freight trains; say, for instance, in their speed, noise, and possibly other factors connected with their operation. Plaintiff testified he went to the usual place on the morning in question to receive a notice, if any, of the running of the train involved and that there was no notice. Hughes v. Mississippi River & B. T. Ry. (Banc), 309 Mo. 560, 582(VI), 274 S. W. 703, 710[12], holds a jury might find that ordinary care in the operation of a railroad requires proper advance notice of extra trains for the protection of section men. Therefore, even though defendants gave no advance notice of extra freight trains, plaintiff is not necessarily deprived of predicating a recovery on defendants' failure to comply with its custom of giving advance notice of the running of extra passenger trains.

The foregoing discussions of the issues rule defendants' attacks against plaintiff's given instructions and defendants' assignments with respect to the refusal of certain requested instructions insofar as they are developed for appellate review.

█ Defendants complain of the introduction of a rule in existence prior to 1927 requiring all trains to whistle for curves and permitting plaintiff's counsel to base a portion of their argument thereon.

Defendants cite no authority, stating none need be cited that a present custom is established by a rule out of existence for ten years or longer. This may well be, but the issue is the admissibility of the evidence—its relevancy as having probative value to establish the ultimate factual issue—the custom. From the record the jury could find that defendants' locomotive engineers continued after 1927 to whistle for curves as they had prior to 1927. We are not prepared to hold the trial court permitted the scope of the inquiry to be unduly extended.

The judgment is reversed and the cause is remanded. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.